### A91A1493. SANDERS v. RAMO.
### A91A1494. CABEZAS v. RAMO.
(416 SE2d 333)

Sognier, Chief Judge.

Joan Ramo, individually and as temporary administrator of the estate of her mother, Geneva Ramo, brought a wrongful death action against Doctors Steven Sanders and Rodrigo Cabezas alleging their malpractice caused the death of her mother. The affidavit of Dr. Laurence Dry was attached to her complaint. OCGA § 9-11-9.1 (a). The defendants answered and moved for summary judgment based on their own affidavits averring that their care and treatment of the decedent met or exceeded the standard of care exercised by the medical profession generally under similar circumstances; Sanders further averred that the death was caused by the decedent's lung cancer. Ramo relied exclusively on Dr. Dry's affidavit to rebut the defendants' motions. The trial court denied the motions, and we granted Sanders' application for interlocutory appeal in Case No. A91A1493.

1. Although no party raises the matter, we note that appellant Cabezas is before this court in Case No. A91A1494 in what is designated a "cross appeal" pursuant to OCGA § 5-6-38 to the interlocutory appeal of Sanders, Cabezas' co-defendant. The Supreme Court has overruled case law interpreting the predecessor statute to OCGA § 5-6-38, Ga. Code Ann. § 6-803, e.g., *Glennville Wood &c. Co. v. Riddlespur*, 156 Ga. App. 578 (1) (276 SE2d 248) (1980), as requiring cross appeals to be filed by appellees against appellants, see *McClure v. Gower*, 259 Ga. 678, 681 (2), fn 3 (385 SE2d 271) (1989), and now interprets OCGA § 5-6-38 together with language in OCGA § 5-6-37 that "all parties to the proceedings in the lower court shall be parties on appeal" to mean that "all parties to all proceedings in the lower court are parties on appeal." *Centennial Ins. Co. v. Sandner, Inc.*, 259 Ga. 317 (380 SE2d 704) (1989). We conclude that Cabezas' appeal is properly before us "[b]ased on the foregoing, and mindful of the legis-

lative intent that the Appellate Practice Act is to be liberally construed in order to bring about a decision on the merits of every case appealed. [Cit.]" *Marsden v. Southeastern Sash &c.*, 193 Ga. App. 597, 598 (1) (388 SE2d 730) (1989) (physical precedent) (two co-defendants who failed to appeal allowed to participate in third defendant's timely filed appeal by sending letter to clerk of this court adopting brief and enumerations of third defendant).

2. Appellants contend the trial court erred by denying their motions for summary judgment because Dr. Dry's affidavit failed to set forth the particulars in which their treatment of appellee's decedent was negligent. See *Loving v. Nash*, 182 Ga. App. 253 (1) (355 SE2d 448) (1987). We note that while Dr. Dry's affidavit had a lesser evidentiary standard to meet when used to fulfill the requirement of OCGA § 9-11-9.1 (a), see *O-1 Doctors Mem. Holding Co. v. Moore*, 190 Ga. App. 286, 287-288 (1) (378 SE2d 708) (1989), it became subject to the stringent evidentiary standards required of expert affidavits made in response to motions for summary judgment when appellee also relied upon it as her expert testimony to create genuine issues of material fact so as to rebut appellants' affidavits. We will review the affidavit accordingly.

Appellee's decedent was a lung cancer patient who on June 29, 1987, underwent a surgical procedure to have a catheter inserted into her subclavian vein by appellant Sanders, a general surgeon, to facilitate the administration of chemotherapy. The procedure was not completed because Sanders had difficulty inserting the catheter into the vein. During her removal from the operating table, the patient began experiencing respiratory distress, which led to cardiac arrest, from which she was resuscitated. Appellant Cabezas arrived at this time and a needle was inserted into the patient's pleural cavity to ascertain if she has sustained vascular damage. No blood or fluid was found. Cabezas, after viewing an x-ray of the patient's chest, made a preliminary diagnosis that the patient had suffered a hemothorax (a collection of blood in the pleural cavity) and first performed a tube thoracotomy then a limited thoracotomy (a surgical incision of the wall of the chest) and determined she had not suffered a hemothorax. Immediately after Cabezas concluded his surgery on the patient, approximately three hours after the subclavian line insertion procedure had been terminated, a vascular surgeon undertook treatment of the patient, performed surgery, discovered vascular damage to the subclavian artery, and repaired the damage. Appellee's decedent died on July 13, 1987.

In her complaint, appellee alleged that Sanders "injured [her decedent] by causing a large dissection of the subclavian artery"; that the decedent "suffered massive blood loss as a result"; that Cabezas, who thought there was a hemothorax but whose surgery showed oth-

erwise, "failed to take further action to prevent massive blood loss"; and that the decedent's death was caused or substantially contributed to by the massive bleeding resulting from the dissection. In support of her complaint, she submitted Dr. Dry's affidavit, in which he set forth his qualifications and averred that he was a licensed medical doctor in good standing in Tennessee and that his opinions were based primarily on his review of the decedent's medical records.[1] Dr. Dry then averred that it was his opinion, "based on reasonable medical certainty, that the departure from reasonable standards of surgical care and skill at the hands of [appellants] caused the untimely death of [appellee's decedent.]" No statement in Dr. Dry's affidavit indicated that he was familiar with the standard of care applicable or revealed what standard of care he was applying. He merely referred to "reasonable standards of medical care," which may or may not be the minimum standard of acceptable professional conduct to which appellants were held.

In Georgia, "the standard to be used to establish professional medical negligence under OCGA § 51-1-27 is that standard of care which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally." (Citations and punctuation omitted.) *McDaniel v. Hendrix*, 260 Ga. 857, 859 (1) (401 SE2d 260) (1991). Once the defendant in a malpractice suit has carried his burden on motion for summary judgment, the plaintiff must respond with an expert's affidavit which "must state the particulars in which the treatment was negligent, including an articulation of the minimum standard of acceptable professional conduct, and how and in what way defendant deviated therefrom. [Cits.]" *Hillhaven Rehabilitation &c. Center v. Patterson*, 195 Ga. App. 70, 71 (1) (392 SE2d 557) (1990).

However, in *Jackson v. Gershon*, 251 Ga. 577, 579 (308 SE2d 164) (1983), the Supreme Court disapproved judging a respondent's expert affidavit on the presence or absence therein of "magic words." "Magic words alone, no matter how often repeated, do not make a fact. Rather, the facts in the record must be sufficient to meet the legal standard embodied in the magic words." Id. " 'The failure of a medical expert to use "magic words" in accusing a colleague of negligence in a medical malpractice case will not deprive his opinion of all efficacy where it is clear that the witness is of the opinion that the colleague failed to exercise due care in treating the patient.' " *Hively v.*

---

[1] We note that while there are medical records attached to the affidavit, it does not appear that they were sworn or certified as required by OCGA § 9-11-56 (e). See *Bush v. Legum*, 176 Ga. App. 395, 396 (1) (336 SE2d 284) (1985). However, no objection was made by either appellant to this formal defect, and accordingly it was waived. See *Parlato v. MARTA*, 165 Ga. App. 758, 759 (1) (302 SE2d 613) (1983).

*Davis*, 181 Ga. App. 733, 734 (353 SE2d 622) (1987). Thus, we will examine the facts in the record as set forth above in light of Dr. Dry's averrals to determine whether any genuine issues of material fact remain for jury consideration.

As to appellant Sanders, Dr. Dry averred specifically that Sanders "departed from reasonable surgical care in inserting [a catheter] so as to cause a large dissection of the subclavian artery. . . . I recognize that injury to vasculature caused by the insertion of a [catheter] is a known complication of this procedure. However, from what I can glea[n] from the records the cause of the 'large dissection of the subclavian artery' in this particular case was substandard surgical skill. In addition, it is the duty of [Sanders] to follow the patient to determine at the earliest possible time that she had in fact been surgically injured by him. His failure to recognize timely the bleeding was substandard. Further, [Sanders'] choice of the left, rather than the right, subclavian vein would bear explanation." As to appellant Cabezas, Dr. Dry averred it was his opinion that Cabezas "departed from reasonable surgical care [in] that given the insertion of the [catheter] and [the decedent's] subsequent signs and symptomatology, it was predictable that this patient was suffering from an extrapleural hematoma. [Cabezas] failed to exercise ordinary surgical standard in his approach. [T]he approach employed by [Cabezas] was certainly not the approach of choice for the working diagnosis. [Cabezas'] failure to properly explore for the predictable causes of her problems was a substantial contributing cause of [the decedent's] death."

From a reading of Dr. Dry's affidavit and the record, it is clear that Dr. Dry's opinion was that because vascular damage is a known complication of the catheter insertion procedure and because of the symptoms the patient displayed, appellants should have recognized that appellee's decedent had sustained vascular damage, should have taken immediate steps to repair that damage, and should have recognized that the blood lost because of the vascular damage would be accumulating outside the pleural cavity, not inside. It is clear that in Dr. Dry's opinion, appellants' failure to recognize that the patient was bleeding and to explore in the proper places for the predictable cause of the patient's problem, rather than the effect of that problem, constituted behavior below the standard expected of surgeons.

"It cannot be said that [Dr. Dry's affidavit] 'merely . . . (presents) a conclusory opinion that the defendant[s were] negligent or failed to adhere to professional standards of conduct without stating the parameters of such conduct and the particulars of the defendant[s'] deviation therefrom. . . .' [Cit.] Instead, . . . the [affidavit] set out what should have been done and compared that to what was done. [Cit.] This proof . . . must be viewed in favor of the party opposing the motion [for summary judgment.] [Cit.]" *Dent v. Memorial*

*Hosp. of Adel*, 200 Ga. App. 499, 504 (408 SE2d 473) (1991). When so viewed, it is clear that " '[h]ere there was expert testimony . . . which was not inconsistent with plaintiff's contention that defendant[s] failed to exercise the requisite professional care, skill and diligence.' " *Jackson*, supra at 580. Therefore, appellee's expert's affidavit was sufficient to create a genuine issue of fact as to appellants' negligence. See *Traylor v. Moyer*, 199 Ga. App. 112-114 (1) (404 SE2d 320) (1991). Accordingly, we find no error in the trial court's denial of appellants' motions for summary judgment.

*Judgments affirmed. McMurray, P. J., and Andrews, J., concur.*

DECIDED FEBRUARY 13, 1992 —
RECONSIDERATION DENIED FEBRUARY 25, 1992.

*Love & Willingham, Daryll Love, Robert P. Monyak*, for appellant.

*Nickerson & Tuszynski, Thomas Henry Nickerson*, for appellees.